UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIC WESSON,

        Plaintiff,

v.

DEBORAH GUNN,

        Defendant.

                               /

Case No. 1:14-cv-1075

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. At the time he filed this action on October 15, 2014, plaintiff was incarcerated at the Central Michigan Correctional Facility (STF). However, he is no longer incarcerated, having been paroled on November 3, 2015, *see* Change of Address (docket no. 23). This matter is now before the Court on defendant's motion for summary judgment (docket no. 11).

    **I.**    **Background**

Plaintiff was found guilty of assault with intent to commit murder and in 1997 was sentenced as a second habitual offender to serve 200 months to 350 months of incarceration. Compl. (docket. no. 1, PageID.8). He was also sentenced to serve two years on a separate conviction for possession of a firearm during the commission of a felony. *Id.* While incarcerated, plaintiff sought to reduce his minimum calendar sentence. The MDOC has a procedure for obtaining this relief. The relevant policy directive, MDOC Policy Directive 03.01.102, recognizes that under the Michigan

Court of Appeals decision in the *Trudeau* case[1], the minimum sentences for habitual offenders are treated differently depending on when the offender was sentenced. As Court explained in *Lamb v. Bureau of Pardons & Paroles*, 106 Mich. App. 175, 307 N.W.2d 754 (1981):

> To reiterate, *Trudeau* did not require that good time be denied those sentenced as habitual offenders. It merely held that the law placed an additional condition on the parole of habitual offenders prior to the calendar minimum sentence. Thus, all defendants sentenced as habitual offenders are entitled to good time. Those defendants who committed the crimes for which they were sentenced as habitual offenders prior to February 4, 1978, may be paroled at their net minimum sentence without the approval of the sentencing judge. A defendant who commits such a crime on or after February 4, 1978, should be subject to *Trudeau* and **should not be paroled prior to the calendar minimum sentence without the approval of the sentencing judge.**

*Lamb*, 106 Mich. App. at 187 (emphasis added).

MDOC Policy Directive 03.01.102 provides a procedure for implementing the *Trudeau* decision, recognizing that there are two different categories of habitual offenders:

> 1. Habitual offenders who committed their offense prior to February 4, 1978. They may be paroled after the expiration of the Special Good Time (SGT) minimum without the approval of the sentence judge or his/her successor. Their earliest release date (ERD) is the SGT. In short, they are treated the same as all other prisoners who earn good time.
>
> 2. Habitual offenders who committed their offense on or after February 4, 1978. They cannot be paroled prior to the expiration of their calendar minimum without the approval of the sentencing judge or his/her successor. Although the SGT and Regular Good Time (RGT) minimums or the Potential Minimum (PMI) and Actual Minimum (AMI) must be computed, the prisoner is not eligible for parole on either the SGT or PMI or any time prior to the calendar minimum without approval of the sentencing judge. The ERD remains the calendar minimum in the absence of such approval.

MDOC Policy Directive 03.01.102 ¶ A.

---

[1] *People ex rel. Oakland Cty. Prosecuting Attorney v. State Bureau of Pardons & Paroles*, 78 Mich. App. 111, 259 N.W.2d 385 (1977).

The policy directive sets out a procedure for habitual offenders, like plaintiff, whose offenses were committed on or after February 4, 1978:

Parole and Community Residential Programs (CRP) Eligibility

C. Approval by the sentencing court allowing the Parole Board to parole prior to the calendar minimum must be in the form of written correspondence from the court to the Board clearly indicating that jurisdiction is given to the board to approve parole prior to the calendar minimum. The Parole Board shall contact the court to clarify the issue. Language such as "I grant good time" or "I do not oppose good time being given" will not be interpreted as approval by the sentencing court since good time or disciplinary credits are a statutory right and not subject to judicial approval or disapproval.

D. If the sentencing court declines to give approval for parole prior to the calendar minimum, the ERD remains the calendar minimum.

E. If the court gives approval, the ERD shall be changed to the SGT/PMI and the Board may parole based on the new ERD. Security classification, and eligibility for reduced custody and CRP, will also be affected based upon the new ERD. Following confirmation by the Board, Central Records shall notify the Records Office of the institution where the prisoner is housed who shall then remove the calendar date from CMIS and update the habitual credit flag. The Records Office shall issue a new timeslip to reflect this change.

F. The prisoner would then be processed for parole consideration the same as non-habitual offenders. If the SGT/PMI is past when approval is given, the prisoner shall be heard by the Board as soon as possible and, if appropriate, a CRP application should be submitted.

G. Good time or disciplinary credits available between the SGT/PMI and the calendar minimum are available for forfeiture, restoration or not granting by the Warden whether or not approval for parole is requested by the Board or granted by the court.

H. Staff shall instruct prisoners that they should contact their respective Program Classification committee or Classification Director, and not the sentencing court, if they believe their case warrants parole consideration prior to the calendar minimum. If supported by the classification staff and by the Warden, the case shall be referred by the Warden to the Parole Board for consideration.

Policy Directive 03.01.102.[2]

It appears that plaintiff previously attempted to contact his sentencing judge directly contrary to the procedure set forth in Policy Directive 03.01.102. In a letter dated March 20, 2006, 17th Circuit Court Judge Dennis B. Leiber advised plaintiff that he received plaintiff's "recent letter and supplemental documentation asking for authorization for the awarding of goodtime/disciplinary credits for the purposes of parole consideration prior to the completion of your calendar minimum." Judge Leiber Letter (docket no. 19-1, PageID.174). However, Judge Leiber stated that he was "unable to comply with [plaintiff's] request at this time." *Id.*

### II.     Plaintiff's Complaint

Plaintiff filed a 35-page complaint against defendant, Resident Unit Manager (RUM) Deborah Gunn, for interfering with his ability to obtain an early release. His complaint alleged as follows. Plaintiff was transferred to West Shoreline Correctional Facility (MTF) on December 15, 2010. Compl. at PageID.9. On November 1, 2012, plaintiff went to defendant's office and asked for assistance placing a request with the Classification Director for consideration of parole as allowed under Policy Directive 03.01.102 (sometimes referred to as "the habitual offender program"). *Id.* at PageID.12. Defendant disputed plaintiff's claim of entitlement under the habitual offender program, exhibited a "visibly negative attitude," and asked if plaintiff wanted a transfer to another prison. *Id.* at PageID.12-13. Plaintiff declined and said that he wanted to address the matter with the warden at the warden's forum. *Id.* at PageID.13. Defendant was angry and stated that she

---

[2] The Court notes that while the policy directive sets forth a procedure which allows habitual offenders such as plaintiff to request a review by the Classification committee/Classification Director and to have the warden to refer him to the Parole Board for consideration of parole, plaintiff has no inherent constitutional right to parole. *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 11(1979); *Bullock v. McGinnis*, 3 Fed. Appx. 340, 342 (6th Cir. 2001).

was going to tell the warden how she felt about it. *Id.* A few weeks later, plaintiff was told to pack up his property for transfer to another facility. *Id.*

Plaintiff was the material coordinator for the MTF's "Christmas Bag" project responsible for assembling the prison population's annual gift bags in December 2012. *Id.* at PageID.14. When plaintiff told defendant that his transfer would disrupt the gift bag project, defendant stated that she did not realize that the transfer would happen so quickly. *Id.* When plaintiff accused defendant of transferring him because he put in a request related to the habitual offender program, defendant stated that she was shocked because she would never have put plaintiff in for a transfer if he had not requested it. *Id.* Plaintiff alleged that defendant "fabricated the claim" that requested a transfer and spoke to Deputy Warden Smith at a warden's forum "pre-meeting" about the transfer. *Id.* at PageID.14-15. Deputy Warden Smith spoke to defendant and according to plaintiff a prisoner told him that "the Deputy Warden had advised him [the other prisoner] that the Plaintiff's transfer was cancelled." *Id.* at PageID.15.

Plaintiff went to defendant's office to ease the tension but as he began to apologize defendant yelled at him, stating "I think it's wrong, but your transfer is cancelled." *Id.* at PageID.16. Plaintiff was upset about defendant's attempt to transfer him, was "forced to live in hiding" from defendant, and suffered intense anxiety, headaches and stress. *Id.* at PageID.16-17. On or about December 18, 2012, during the packaging portion of the Christmas project, Recreation Director Hazel told plaintiff that as soon as his term on the warden's forum was over, plaintiff would be transferred because he had "pissed off his RUM." *Id.* at PageID.17.

5

Some weeks later, on January 23, 2013, plaintiff submitted a request to Classification Director Perry under the habitual offender program. *Id.* The next day, Director Perry recommended to Warden Berghuis that plaintiff be considered for the program, stating:

> Prisoner Wesson 254900 is requesting a referral to be considered for Parole prior to his calendar minimum. Wesson has been misconduct free since 2010 and I am referring his case to you for further review. He falls under the Habitual Offender guidelines. I have attached PD 03.01.102 Habitual Offenders which covers this issue.

Memorandum (Jan. 24, 2013) (docket no. 1-1, Page ID.40).

On January 28, 2013, defendant wrote plaintiff a misconduct for being out of place. *Id.* at PageID.18. According to plaintiff, this was falsely reported and a Sergeant pulled the misconduct after confirming that plaintiff had permission to be in the area. *Id.* at PageID.19. On February 1, 2013, plaintiff's term at the warden's forum expired. *Id.* On March 4, 2013, defendant approved a security classification screen to transfer plaintiff to the Central Michigan Correctional Facility (STF). *Id.* Deputy Warden Smith signed a transfer order the next day which involved a prisoner trade request by STF. *Id.*; Transfer Order (docket no. 1-1, PageID.42).

Plaintiff was transferred from MTF to STF on March 7, 2013. *Id.* at PageID.20. After his transfer to STF, plaintiff investigated the status of his request made to MTF Warden Berghuis, and with the assistance of an STF employee, determined that as of March 27, 2013, MTF Warden Berghuis had not reviewed the Classification Director Perry's referral. *Id.* at PageID.21. The STF employee, Assistant Resident Unit Supervisor (ARUS) Plowman, printed out the MTF documents and told plaintiff that she was delivering them to STF Warden Larson. *Id.* On or about March 29, 2013, ARUS Plowman advised plaintiff that Warden Larson "refused to act on a Habitual Offender's referral from another prison." *Id.* at PageID.21-22. According to plaintiff, ARUS

6

Plowman advised him that "STF Operating Procedure and institutional chain of command had tougher requirements for Habitual Offender recommendations than did MTF, and that the Committee would be harder to persuade than Classification Director Perry at MTF." *Id.* at Page ID.22.

In April 2014, while at STF, plaintiff filed a grievance against MTF Warden Berghuis for not responding to his request. *Id.* at PageID.22. On May 10, 2013, before Warden Berghuis responded to the grievance, plaintiff was called to ARUS Plowman's office and met with Plowman and two other individuals who identified themselves as the STF Classification Committee for reviewing his habitual offender request. *Id.* at PageID.22-23; Policy Directive 03.01.102 ¶ H. Plaintiff advised the committee that he had been reviewed at MTF and that he had filed a grievance against Warden Berghuis to respond to the referral issued by MTF Classification Director Perry. *Id.* at PageID.23. One of the STF Classification Committee members stated that they were going to do what they came to do and that plaintiff could complain later. *Id.* The meeting ended when the STF Classification Director stated that he was willing to wait until plaintiff's grievance at MTF was exhausted. *Id.*

On May 17, 2013, plaintiff filed another grievance, this one directed at the STF Committee, STF Warden Larson, MTF Warden Berguis and defendant "for attempting to void the benefits of the (positive) recommendation of MTF Classification Director Perry's referral for his parole." *Id.* at PageID.23-24. Plaintiff characterized these actions as a conspiracy directed at him. *Id.* Plaintiff exhausted the grievance against MTF Warden Berghuis without his requested relief because Warden Berghuis was not obligated to respond to a habitual offender referral after plaintiff's transfer to another correctional facility. *Id.* at PageID.24.

At the heart of plaintiff's claim in this action is that his transfer to STF caused him to lose his opportunity for MTF Berghuis to review a positive referral for the program prepared by MTF Classification Director Perry. *Id.* Plaintiff's complaint sets forth four counts. In Count I, "Access to the Court - Retaliation Claim," plaintiff alleged that on November 1, 2012, he exercised his First Amendment right to access the court when he asked defendant for assistance to place a request with the MTF Classification Director to be reviewed under the program. *Id.* at PageID.25. Defendant's attempted transfer and later transfer of plaintiff to STF was in retaliation for him accessing the Court system. *Id.* at PageID.25-28.

In Count II, "Free Speech retaliation Claim," plaintiff alleged that on November 1, 2012, he exercised his First Amendment right to free speech when he asked defendant for assistance to place a request for review under the program. Defendant's attempted transfer and later transfer of plaintiff to STF was in retaliation for him exercising his right of free speech. *Id.* at PageID.28-31.

In Count III, "First Amendment (Petition Clause) retaliation claim," plaintiff alleged that on November 1, 2012, he exercised his First Amendment Right to petition the government for the redress of grievances when he declared his intention to seek clarification of the program's provisions from MTF Warden Berghuis. *Id.* at PageID.31. Defendant's attempted transfer and later transfer of plaintiff to STF was in retaliation for him petitioning the government. *Id.* at PageID.31-34.

Finally, in Count IV, "Intentional infliction of emotional distress," plaintiff alleged that defendant's conduct was deliberate, intentional and malicious and resulted in severe and serious emotional distress in violation of state law. *Id.* at PageID.34.

Plaintiff alleged that as a result of defendant's actions he suffered: (1) the loss of his "highly valued" prison work assignment which resulted in an economic loss exceeding $500 and impaired his ability to obtain parole in the future; (2) the impairment of his family's ability to visit him; "the loss of opportunity to have a Warden review a referral for parole under the MDOC's Habitual Offender provisions, which along with his confinement at STF, combined to foreclose the Plaintiff's ability to access the authority possessed by his sentencing judge to approve parole earlier that originally sentenced"; mental and emotional pain; and a violation of his First Amendment rights. *Id.* at PageID.28, 31, 33-34. For his relief, plaintiff seeks monetary damages in excess of $75,000.00. *Id.* at PageID.34-35.

### III. Defendant's motion for summary judgment

#### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. First Amendment retaliation claim

#### 1. Legal standard

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). It is axiomatic that "[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).

To prove a First Amendment retaliation claim, plaintiff must establish three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was

motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

### 2. Protected conduct

Plaintiff's retaliation claim is based upon alleged protected conduct under the First Amendment involving his right of access to the courts, the Free Speech Clause, and the Petition Clause. Defendant's motion does not address the first element of plaintiff's three retaliation claims alleged in this action, merely stating that plaintiff "has arguably established" that he engaged in protected conduct. After reviewing the record, the Court concludes that plaintiff's Counts I and II fail because this action does not implicate plaintiff's right of access to the courts or the Free Speech Clause.

Count I seeks retaliation based upon defendant's interference with plaintiff's right to access the courts. As the Supreme Court explained:

> This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. The right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 131 S. Ct. 2488, 2494 (2011) (internal quotation marks and brackets omitted). Plaintiff's Count I fails to state a claim for relief, because his constitutional right to access the courts is limited to direct appeals, habeas corpus applications, and civil rights claims. *See Thaddeus-X*, 175 F.3d at 391 ("a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only"). Here, plaintiff's alleged protected conduct was a request he participate in the habitual offender program in order to reduce

his minimum term of imprisonment. This procedure does not implicate plaintiff's right to access the courts because it is neither a direct appeal, a habeas corpus application nor a civil rights claim.

Count III is similar to Count I in that involves redressing wrongs, but Count III refers to plaintiff's right under the Petition Clause to seek relief from the MDOC. "The Petition Clause guarantees the right to 'petition the Government for a redress of grievances.'" *Griffin v. Berghuis*, 563 Fed. Appx. 411, 415 (6th Cir. 2014), quoting U.S. Const. Amend. I. As an individual in the custody of the state, plaintiff is entitled to petition the state for redress of grievances. *See Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). Although plaintiff's claim is not grieving a condition of confinement, he was seeking relief from the MDOC pursuant to Policy Directive 03.02.102 ¶ H, which explicitly authorizes prisoners sentenced as habitual offenders to "contact their respective Program Classification committee or Classification Director, and not the sentencing court, if they believe their case warrants parole consideration prior to the calendar minimum." The Court views the Program Classification Committee or the Classification Director as one of the "other forums" which a prisoner can appeal to for resolution of a legal dispute, in this case a habitual offender's request for release before the minimum calendar sentence. *See Borough of Duryea, Pa.*, 131 S. Ct. at 2494. Accordingly, the Court concludes that this request is properly characterized as protected conduct under the First Amendment's right to petition the government. *Id.*

Finally, plaintiff's Free Speech claim in Count II does not involve the exercise of free speech but rather a claim for redress of grievances. The purpose behind plaintiff's discussion with defendant on November 1, 2012 was for assistance in making a request to participate in the habitual offender program. It appears that plaintiff was proceeding as allowed under the policy directive by asking staff for assistance. *See* Policy Directive 03.02.102 ¶ H. As discussed, *supra*, this situation

should be characterized as conduct protected by the Petition Clause. This is not a scenario where a prisoner alleged that his ability to engage in free speech was curtailed by a prison regulation. *See, e.g., Griffin*, 563 Fed. Appx. at 415 ("to the extent that [the prisoner] invokes the Free Speech Clause, the general rule - that a prison inmate's speech is not protected by the First Amendment if it is 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system' - governs his claims"); *Jones v. Campbell*, 23 Fed. Appx. 458 (6th Cir. 2001) (prison policy providing that bulk rate mail such as magazines and catalogs would not be processed and inmates who wanted to receive items normally sent bulk rate had to pre-pay first or second class postage did not violate an inmate's First Amendment rights). For these reasons, plaintiff's claim in Count II does not state a claim for retaliation based upon free speech.

To summarize, defendant is entitled to summary judgment as to Counts I and II because plaintiff cannot demonstrate that he engaged in protected conduct of accessing the courts or engaging in free speech. The Court will address plaintiff's retaliation claim under Count III which alleged that he engaged in protected conduct under the Petition Clause.

### 3. Plaintiff's declaration

After plaintiff filed his response to defendant's motion for summary judgment, he filed a declaration pursuant to Fed. R. Civ. P. 56(d) seeking to stay the motion for summary judgment until he can conduct discovery to have the MDOC authenticate documents he submitted to the Court. *See* Declaration (docket no. 21).[3] Fed. R. Civ. P. 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify

---

[3] The Court notes that plaintiff's declaration referred to Fed. R. Civ. P. 56(f), the predecessor to the current Fed. R. Civ. P. 56(d).

its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). The trial court's allowance of additional discovery under Fed. R. Civ. P. 56(d) (formerly Rule 56(f)) is discretionary. *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 416 (6th Cir. 2009). "The affidavit required by [former] Rule 56(f) to support a request for additional discovery must indicate the need for discovery, what material facts may be uncovered, and why the information has not been previously discovered." *Id.* The Sixth Circuit has cautioned that in the typical case, when the parties have no opportunity for discovery, denying a motion under Rule 56(d) and ruling on a summary judgment motion is likely to be an abuse of discretion. *Siggers v. Campbell*, 652 F.3d 681, 695-96 (6th Cir. 2011). However, "[i]t is not an abuse of discretion for the district court to deny the discovery request when the party makes only general and conclusory statements [in its affidavit] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of the [document] to be discovered." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004).

Here, plaintiff does not establish the need for discovery in order to respond to defendant's motion for summary judgment. First, although plaintiff has not engaged in discovery, he filed a timely response to the motion with numerous exhibits. *See* Response (docket no. 19); Fed. R. Civ. P. 56(a) ("[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery"). Second, plaintiff's reason for requesting a stay is without merit because defendant does not object to the authenticity of any MDOC documents submitted by plaintiff in this action. Accordingly, there is no basis to grant plaintiff relief under Fed. R. Civ. P. 56(d).

      **4.**      **Adverse action**

Defendant seeks summary judgment because plaintiff cannot establish an adverse action. "[G]enerally, a transfer to another institution 'does not constitute an adverse action since a transfer is merely an ordinary incident of prison life.'" *Jones v. Caruso*, 421 Fed. Appx. 550, 553 (6th Cir. 2011), quoting *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir.2005). Because prisoners are expected to endure more than the average citizen and enjoy no protected right to remain incarcerated in a given correctional facility, a transfer from one prison to another generally will not be considered sufficiently adverse to deter a prisoner of ordinary firmness from engaging in protected conduct. *See Hix. v. Tenn. Department of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir. 2006) (stating that "this Court has held that in the context of a First Amendment retaliation claim, a prisoner is expected to endure more than the average citizen and enjoys no protected right to remain incarcerated in a given correctional facility").

However, the Sixth Circuit has carved out an exception for cases in which foreseeable, negative consequences "inextricably follow" from the transfer. For example, in *Siggers-El* the court found that a transfer would deter a person of ordinary firmness from engaging in protected conduct where the foreseeable consequences of the transfer inhibited the prisoner's ability to access the courts, specifically the loss of his "high paying job that he needed in order to pay his attorney" and the fact that the prisoner's transfer "made it more difficult for his attorney to visit with or represent him because he was moved further away from her." *Id.* at 702. In these exceptional cases, the question of whether a particular retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact. *See Jones*, 421 Fed. Appx. at 553 ("to survive summary judgment on his retaliation claim, Jones needed to make a

sufficient showing of the foreseeable, negative consequences that inextricably followed from his transfer") (internal citations, quotation marks and brackets omitted).

Here, plaintiff claims: that his transfer interfered with his prison job assignment; that his transfer impaired his ability to obtain parole in the future; that his transfer impaired his family's ability to visit him; and that his transfer caused him to lose his opportunity to have Warden Berghuis review a referral for parole under the habitual offender program. This is not an exceptional case involving foreseeable, negative consequences that inextricably followed from plaintiff's transfer. "A transfer to the general population of another prison is not considered sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights." *Jewell v. Leroux*, 20 Fed. Appx. 375, 378 (6th Cir. 2001). While plaintiff alleged that it would be harder to obtain special treatment under the habitual offender program at STF than at MTF, this is not a relevant consideration. The transfer to a different correctional facility which is perceived as being "notoriously harsh" is not sufficient to create a jury issue on the question of whether the prisoner's transfer was an adverse action. *Colvin v. Foy*, No. 14-1456 (6th Cir. June 18, 2015) (unpublished order). *See Ward v. Dyke*, 58 F.3d 271, 274-75 (6th Cir.1995) ("the ability to transfer prisoners is essential to prison management" and it is not relevant to retaliation analysis that the new prison is "less desirable" than the old prison). Plaintiff followed the procedure to obtain MTF Warden Berghuis' referral to the Parole Board, but that referral was not forthcoming. After his transfer, plaintiff had an opportunity to petition the government for this relief, i.e., to appear before the Classification Committee at STF for parole consideration under the policy directive. However, plaintiff did not avail himself of that opportunity. Rather, he employed a strategy of filing grievances in an apparent attempt to have Warden Berghuis and/or Warden Larson issue him a referral based

upon Classification Perry's memorandum. Viewing the evidence in the light most favorable to plaintiff, the Court concludes that he did not suffer the requisite adverse action to support a claim of retaliatory transfer. Accordingly, defendant's motion for summary judgment should be granted.[4]

### IV. State law claim

Finally, plaintiff alleged that defendant committed the state law tort of intentional infliction of emotional distress. The Court exercised its supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367, presumably because the claim was intimately related to the alleged § 1983 violation. *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy"). The dismissal of plaintiff's federal claim against defendant, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against these defendants. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." Thus, once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998). As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996). *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("[n]eedless decisions of state law should be avoided

---

[4] Because plaintiff did not establish an adverse action sufficient to support a claim for retaliatory transfer, it is unnecessary for the Court to address the issue of causation.

both as a matter of comity and to promote justice between the parties"). Here, the Court has rejected plaintiff's federal claim. There is no reason to retain supplemental jurisdiction over plaintiff's state law claim. Accordingly, plaintiff's state law claim should be dismissed.

### V. Recommendation

For these reasons, I respectfully recommend that defendant Gunn's motion for summary judgment (docket no. 11) be **GRANTED** as to the federal claims alleged in Counts I, II and III.

I further recommend that plaintiff's state law claim alleged in Count IV be **DISMISSED** pursuant to 28 U.S.C. § 1367.

I further recommend that this action be **TERMINATED**.


Dated: February 29, 2016                /s/ Ray Kent
                                        RAY KENT
                                        United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).